**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

WAYNE B. LYNCH,
*Administrator of the Estate of Donovon W. Lynch,*
*Deceased,*

　　　　　　　Plaintiff,

　　　v.　　　　　　　　　　　　　　　　　Action No. 2:21cv341

SOLOMON D. SIMMONS, III, *et al.,*

　　　　　　　Defendants.

**UNITED STATES MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

This matter is before the Court on the motion for approval of settlement filed by Wayne B. Lynch, Administrator for the Estate of Donovon W. Lynch. ECF No. 116. Due to disputes regarding attorneys' fees and costs, ECF Nos. 107–08, the Court ordered plaintiff's past and present counsel of record to file documents and legal memoranda addressing issues regarding their entitlement to attorneys' fees and costs.

For the reasons stated herein, the Court **RECOMMENDS** that the motion to approve the settlement, ECF No. 116, be **GRANTED in part** and **DENIED in part**.

## I.　　FACTUAL BACKGROUND & RELEVANT PROCEDURAL HISTORY

In this action brought by Wayne B. Lynch, on behalf of the estate of Donovon W. Lynch ("the Estate" or "plaintiff")[1], against Officer Solomon D. Simmons, III, and the City of Virginia

---

[1] The Court will refer to the plaintiff, Wayne B. Lynch, the administrator of the estate of Donovan W. Lynch, as the Estate for the sake of simplicity.

Beach ("the City"), the Estate asserts claims pursuant to 42 U.S.C. § 1983, and for gross negligence, assault and battery, survivorship, and wrongful death. ECF No. 1. The Estate filed the complaint on June 21, 2021, and after a laborious year and a half of litigation, the parties reported to the Court and the public in early December 2022 that a $3,000,000.00 settlement had been reached. ECF No. 74; *'My son is vindicated;' Donovon Lynch's Family Speaks on $3M settlement*, 3WTKR, https://www.wtkr.com/news/my-son-is-vindicated-donovon-lynchs-family-speaks-on-3m-settlement (last visited September 7, 2023). On December 19, 2022, the Estate filed a notice of settlement and motion to vacate all deadlines. ECF No. 74. On December 21, 2022, the Court granted the motion to vacate and ordered the parties to file a stipulated settlement agreement by December 23, 2022. ECF No. 75.

Although the parties signed a memorandum of understanding ("MOU") on December 8, 2022, following a mediation, ECF No. 77, a dispute later arose about provisions memorializing the settlement and the Estate refused to sign that document, reportedly on the advice of Jeffrey Reichert, Esq.[2] ECF No. 76, at 1–2. This disagreement led to the Estate's then counsel of record, Justin Fairfax, Esq., and Thomas Martin, Esq., jointly with the counsel for all parties, moving to "enforce the Settlement agreed upon by the parties and their counsel, as memorialized in the [MOU] signed by all parties and their counsel, and further memorialized by a Settlement Agreement agreed upon by the attorneys for the parties." *Id.* at 1; *see also* ECF Nos. 80, 82–83.

---

[2] Documents filed with the Court identify Reichert as, among other things, an "attorney of fact and legal representative" for the estate. *See e.g.*, ECF No. 116-2; *see also* ECF No. 114-2, at 3 (identifying Reichert as "legal representative" of the estate); ECF No. 37, at 1–2 (describing Reichert as an attorney who assisted the Lynch family in investigating the death of Donovon Lynch). Reichert, however, is not and never has been counsel of record for plaintiff in this litigation. Nor did he sign the MOU or the final memorialization of the parties' agreement. ECF No. 77, at 3; ECF No. 104, at 8.

2

Joseph V. Sherman, Esq., then conditionally filed[3] a memorandum in opposition to the joint motion to enforce settlement agreement on behalf of the Estate. ECF No. 84. Between January and April 2023, the parties returned to mediation and continued unsuccessful negotiations to resolve the dispute. *See* ECF No. 86 (ordering the parties to engage in a settlement conference and deferring ruling on pending motions); ECF No. 95 (ordering the parties to appear at a settlement conference on February 16, 2023). Following a status conference, the parties filed a joint notice requesting an evidentiary hearing to determine whether a binding settlement agreement existed. ECF No. 101. The Court held a hearing on May 24, 2023, and before the conclusion of the hearing, counsel indicated it was unnecessary to continue as the parties had agreed to a written memorialization of the settlement. ECF Nos. 104, 106. Before concluding the hearing, the Court conducted a colloquy of the signatories to that agreement, found that each had acted knowingly and voluntarily, and ordered that the release and agreement be filed. *Id.*

In response to the Court's order, ECF No. 106, the Estate thereafter reported that "disputes remain about payment of costs and attorney's fees," ECF Nos. 107–08. Thereafter, Fairfax and Martin filed a memorandum in opposition to plaintiff's status report and request for an evidentiary hearing. ECF No. 114. In the memorandum, Fairfax and Martin requested that the Court find that they are "owed a combined $600,000 in attorneys' fees per the plain, unambiguous and enforceable language and terms of their binding contingency fee contract" and "an additional $135,495.81 in documented costs and expenses." *Id.* at 3; ECF No. 117 (attaching documentation of expenses and costs). In the alternative, Fairfax and Martin seek recovery under quantum meruit, requesting

---

[3] The memorandum was conditionally filed because the Court had not yet granted Lynch's motion to substitute counsel. On December 28, 2022, the Estate moved to substitute counsel from Fairfax and Martin to Sherman, ECF No. 79, which was granted April 13, 2023, ECF No. 100. Therefore, Fairfax and Martin were still counsel of record at the time the memorandum was filed.

a combined $1,177,503.06 in attorneys' fees and expenses.  ECF No. 114, at 3.

The Estate opposes Fairfax and Martin's request for attorneys' fees and costs contending that the request is unreasonable, and that Fairfax and Martin were fired "for good cause" and forfeited all or part of their fee.  ECF No. 131, at 2, 4–5.  The Estate contends that Fairfax and Martin "failed to complete the services owed by contract" to the Estate by "refus[ing] to negotiate" terms memorializing the MOU and "abandon[ing] [the Estate's] interest in pursuing justice for Donovon through a possible criminal investigation."  *Id.* at 4–5.

Fairfax and Martin contend that they were not fired for cause, but rather that the Estate is attempting to "avoid paying the attorney[s'] fees clearly due."  ECF No. 133, at 1.  Fairfax and Martin explain that they conducted nine depositions and "worked tirelessly to familiarize themselves with the case."  *Id.* at 4.  This, they argue, caused them to incur expenses—such as traveling to Norfolk, engaging experts, and "reinvigorat[ing]" public support.  *Id.*  Fairfax and Martin also highlight that, although the Estate purported to terminate them on December 26, 2022, they continued to represent the Estate until the Court allowed them to withdraw on April 13, 2023. *Id.* at 5.

Anchor Legal Group, PLLC ("Anchor"), filed a memorandum seeking payment of Anchor's unpaid costs, expenses, and attorneys' fees totaling $238,902.68.  ECF No. 115; 115-7, at 2.  Anchor was retained by the Estate before the complaint was filed and remained counsel of record until October 13, 2022.  ECF No. 115, at 1.  Anchor performed work for one year on an hourly basis until Anchor and the Estate switched to a contingency fee agreement.  *Id.* at 1–2.  Anchor was initially engaged as "local counsel," with Quinn Emanuel Urquhart & Sullivan ("Quinn Emanuel") serving as "lead counsel."  *Id.* at 2.  However, as the case progressed, Anchor contends that it was serving as "co-counsel."  *Id.*  Anchor was "terminated on the same day that

expert disclosures were submitted on behalf of [the Estate], and the firms were in the process of setting depositions of key witnesses with defense counsel." *Id.* After terminating Anchor on October 6, 2022, ECF No. 46; ECF No. 115, at 2, the Estate attempted to re-hire Anchor, which Anchor declined, partly due to concerns over Reichert's involvement with the Estate, ECF No. 115, at 3; ECF No. 115-6, at 1. Prior to the December 8, 2022 mediation, Anchor submitted a notice of lien to counsel for all parties on December 6, 2022. ECF No. 115, at 3.

The Estate contests Anchor's claim and argues that Anchor's "reasonable attorneys' fees should not exceed $100,000." ECF No. 132, at 1. The Estate argues that a cut of "almost 50 percent of [Anchor's] high-end request" is justified because of "an unsubstantiated hourly rate combined with an utterly opaque summary of work performed." *Id.* at 2. The Estate contends that Anchor overstaffed the litigation and that its billings contain impermissible block billing and duplicative time entries. *Id.* at 9–11.

In reply, Anchor supplied an affidavit of a local attorney, C. Stewart Gill, Jr., in support of the reasonableness of Anchor's rates. ECF No. 136, at 3; ECF No. 136-4. Anchor also supplied an email from Quinn Emmanuel to Anchor demonstrating "the collaboration between the firms" and Anchor's significant role in the litigation. ECF No. 136, at 1–2 (citing ECF Nos. 115-7, 136-2, 136-3). The Estate then filed a sur-reply,[4] which, among other things, states that the Estate "does not challenge the affidavit and recognizes Anchor's rate to be reasonable." ECF No. 142, at 4. The Estate clarifies that the "recommendation of $100,000 in fees was not arbitrary," but rather cuts Anchor's attorneys' fees request by roughly 50% for "duplicative services, block billing, and overworking" the case and only used $100,000.00 because it is a "round number." *Id.*

---

[4] The Court allowed the Estate to file a sur-reply because of the new information contained in the reply. ECF No. 137.

at 2. The Estate also states that it "understood Anchor to be local counsel at all times and nothing submitted by Anchor shows the Estate agreed to a fundamentally different role or benefitted from a greater role from Anchor." *Id.* at 3.

Sherman also filed a statement of costs and fees, ECF No. 118, which was later updated with a supplemental statement, ECF No. 134. Sherman seeks $30,107.00 in attorney's fees and $267.36 in costs. ECF No. 146. Sherman represents that he was hired to oppose the joint motion to enforce the settlement and motion to approve proposed distribution of settlement funds. ECF No. 118, at 1–2. Sherman states he was also hired "to negotiate and litigate settlement terms." ECF No. 118, at 2; ECF No. 104. Sherman expended over 100 hours over six months "briefing, preparing for and executing a settlement conference, and negotiating terms of a final settlement agreement and release of critical importance to the Estate." ECF No. 118, at 3. In Sherman's supplemental statement, he seeks a rate of $250.00 an hour, the "lowest rate claimed by any counsel of record for the Estate in this matter." ECF No. 134, at 2. He contends that his rate and time spent on the case are reasonable and provides an affidavit from local attorney Christian L. Connell, Esq., to opine the same. *Id.*; ECF No. 134-2.

Trey Kelleter, Esq., also claims attorney's fees for work provided to the Estate. ECF No. 126, at 4. He claims $14,025.00 in attorney's fees for a total of 33 hours at an hourly rate of $425.00. ECF No. 147. Kelleter filed a detailed billing summary of all the work performed, his own affidavit, as well as an affidavit from Mr. Connell. ECF Nos. 147-1, 147-2, 149. Kelleter's affidavit details his background, qualifications, work done on this case, and hourly rate. ECF No. 147-2. His work has been limited to opposing Anchor's request for attorneys' fees. *Id.* at 3.

On September 7, 2023, the Court held a hearing on the motion for approval of settlement, ECF No. 116, and convened the parties in interest pursuant to section 8.01-55 of the Code of

Virginia.  Joseph Sherman, Esq., along with Trey Kelleter, Esq., represented the Estate.  Wayne Lynch, the administrator of the Estate, and Lauryn Lynch were present.  Gary Bryant, Esq., represented Officer Simmons.  Christopher Boynton, Esq., and Gerald Harris, Esq., represented the City of Virginia Beach.  Also present were prior counsel for the Estate:  Anthony Gantous, Esq., Joshua Coe, Esq., Justin Fairfax, Esq., and Thomas Martin, Esq.  The court reporter was Jill Trail.

## II.      APPLICABLE LAW

Virginia Code § 8.01-50 provides a cause of action for a party when the death of a decedent is caused by the wrongful act of another.  Damages for wrongful death are circumscribed by Virginia law, which permits recovery to certain statutory beneficiaries for:

> 1. Sorrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the decedent;
> 2. Compensation for reasonably expected loss of (i) income of the decedent and (ii) services, protection, care and assistance provided by the decedent;
>
> 3. Expenses for the care, treatment and hospitalization of the decedent incident to the injury resulting in death;
>
> 4. Reasonable funeral expenses; and
>
> 5. Punitive damages may be recovered for willful or wanton conduct, or such recklessness as evinces a conscious disregard for the safety of others.

Va. Code § 8.01-52.

When a case is brought and includes a claim under the Virginia Wrongful Death Act, Va. Code § 8.01-50, *et seq.*, a court must review and approve the settlement.  Va. Code § 8.01-55 ("The personal representative of the deceased may compromise any claim to damages arising under or by virtue of § 8.01-50 . . . with the approval of the court in which the action was brought.").  If the parties in interest do not agree on the distribution of the settlement, the court "shall direct such distribution as a jury might direct under § 8.01-52."  *Id.*  And, "damages awarded pursuant to

§ 8.01-52 shall be distributed as specified under § 8.01-54." Va. Code § 8.01-53. Pursuant to section 8.01-54, the amount recovered "shall be paid to the personal representative who shall first pay the costs and reasonable attorney's fees and then distribute the amount specifically allocated to the payment of hospital, medical, and funeral expenses." Va. Code § 8.01-54(C); *see Lovelace v. Lovelace*, 375 S.E.2d 750, 753 (Va. 1989) ("Code § 8.01-54 applies to recoveries in actions brought pursuant to Code § 8.01–52; . . . Reading Code §§ 8.01-55, -52, and -54 together, we conclude that the legislature intended the issue of the reasonableness of attorney's fees to be an issue in the settlement of any wrongful death case."). The remainder is then "distributed by the personal representative . . . to the beneficiaries set forth in § 8.01-53; provided that any distribution made to any such beneficiaries shall be free from all debts and liabilities of the decedent." Va. Code § 8.01-54.

The authorized statutory beneficiaries here are Wayne Lynch and Lauryn Lynch. Va. Code § 8.01-53 (stating that, "if there is no surviving spouse, children of the deceased, or children of any deceased child of the deceased," then the beneficiaries are "the parents, brothers and sisters of the deceased, and . . . any other relative who is primarily dependent on the decedent for support or services and is also a member of the same household as the decedent"). During a hearing on August 9, 2023, Lauryn Lynch renounced her interest in any wrongful death claim under oath, ECF No. 144, leaving Wayne Lynch as the sole beneficiary. Va. Code § 8.01-53(C) (explaining that if a beneficiary renounces her interest, then the "damages shall be distributed to the beneficiaries in the same class as the renouncing beneficiary").

### III.  PROPOSED SETTLEMENT

The Estate filed a motion for approval of settlement, which requests approval of the settlement and sets forth a disbursement of the settlement funds in a proposed order. ECF No.

116; ECF No. 126-3.  In the memorandum, the Estate contends that the Court "must disburse settlement funds to Wayne Lynch" as the personal representative of the Estate.  ECF No. 126, at 3 (citing Va. Code § 8.01-54(C)).  The Estate then proposes the following distribution:

- Anchor costs: $25,600.18

- Anchor attorneys' fees to not exceed: $100,00.00

- Fairfax and Martin costs: $9,894.76

- Fairfax and Martin attorneys' fees: $0[5]

- Sherman costs: $267.36[6]

- Sherman attorney's fees: $30,107.00[7]

- Kelleter attorney's fees: $14,025.00[8]

- Funeral expenses: $12,038.60

- US Claims Lien: $62,865.00[9]

- Remainder to Wayne Lynch as beneficiary

---

[5] The Estate indicated it would address Fairfax and Martin's request for fees in a response to the memorandum in support of fees.  ECF No. 126, at 4.

[6] Although Sherman's costs were only $140.97 at the time the motion for approval was filed, ECF No. 126, at 4, Sherman has supplemented for costs later incurred, ECF No. 146.

[7] Sherman's fees were $21,997.50 as of June 20, 2023, ECF No. 126, at 4, but as stated in the Estate's motion for approval, Sherman continued working on this case and has supplemented his request for fees, *id.* ("Mr. Sherman continues to work for the Estate and reserves the right to supplement the amount claimed."); ECF No. 146.

[8] Kelleter's fees were $4,547.50 as of July 5, 2023.  ECF No. 126, at 4.  However, as noted in the Estate's motion for approval, because he continued to work, he updated his attorney's fees.  *Id.* ("Mr. Kelleter continues to work for the Estate and reserves the right to supplement the amount clai[m]ed."); ECF No. 147.

[9] Although the amount in the proposed order was $55,880.00, ECF No. 126-3, at 2, the Estate notes that "interest may accrue after July 20, 2023," ECF No. 126, at 5.  This lien amount was $62,865.00 as of August 3, 2023.  ECF No. 140.

*Id.* at 3–5; ECF No. 126-3.

Because of the reduction the Estate seeks in attorneys' fees and costs, Anchor, Fairfax, and Martin oppose the Estate's proposed distribution. ECF Nos. 119, 121. The City also responded to the motion to approve the settlement, noting that although "the City [took] no position on the specific distribution amounts of settlement proceeds to the various claimants in this matter, the City request[ed] this Court first consider the terms and reasons for the compromise, approve the settlement, and *then* approve and direct the distribution of settlement funds." ECF No. 127, at 5. The City agreed to make direct distributions of the settlement proceeds due to filings that "reveal that prior legal counsel for the Estate believes that there is a possibility that Wayne Lynch, as administrator of the Estate, may not act consistently with his duties as a fiduciary in the distribution of settlement proceeds to claimants." *Id.* at 5–6 (citing ECF Nos. 99, 114–16). The City maintains that Reichert should not receive any payments from the settlement funds because he is not an attorney in this matter. *Id.* at 6–7. The Estate replied contesting the City's assertions, arguing for approval of the Estate's proposed distribution and noting that "Reichert does not make a claim against the Estate."[10] ECF No. 128, at 3–4.

### IV.   DISCUSSION

#### A.   The settlement amount is fair and reasonable.

On March 26, 2021, Donovon Lynch was shot and killed by Officer Simmons. ECF No. 1, ¶¶ 1, 18, 23. The parties have presented vastly different versions of the events surrounding this

---

[10] It is noteworthy that Reichert's representations regarding payment from the Estate have changed. *See* ECF No. 114-1, at 1 (stating on May 20, 2023, that "I also have a bill to submit"); ECF No. 115-2, at 2 (stating on April 24, 2021, that he was "not expecting any payment"); ECF No. 128, at 4 (noting Reichert "acknowledges that his fees cannot come from the settlement funds").

tragedy.  The Estate's version is outlined in the complaint.  *Id.* ¶¶ 1–3, 18–31.  The defendants' version is summarized in the motion seeking approval of the settlement.  ECF No. 127, at 3–4.

The settlement between the parties was reached after discovery had been completed.  *See* ECF No. 33, at 2.  Past and present counsel in this case expended significant time and expense to develop the record in this case—including engaging multiple experts.  The Estate's counsel conducted nine depositions, thoroughly investigated and developed the facts of the case, and engaged in many settlement discussions.  *See* ECF No. 133, at 2–4 (discussing the work that was performed on the case by Fairfax and Martin); *see also* ECF No. 88, at 3.  The settlement appears to have been negotiated at arm's length by the parties, each of which was represented by competent and experienced counsel.  The parties ultimately settled the case after a 12-hour mediation before Judge Michael Allen (Ret.) on December 8, 2022.  As already noted, the parties thereafter argued about the written memorialization of the settlement, tried to unsuccessfully resolve these disputes in mediation, and eventually resolved them during the evidentiary hearing before the Court on May 24, 2023.

The settlement amount agreed upon among the parties—$3,000,000.00—is substantial.  Indeed, the City represents that $3,000,000.00 is the "highest payment for a wrongful death case in the City's history."  ECF No. 127, at 4 n.2.  Given the competing factual assertions of the parties, the outcome of any motions practice and trial was uncertain, at best, in the absence of a settlement.  Therefore, a settlement of $3,000,000.00 is fair and reasonable under the circumstances.

**B.    Allocation of Settlement Funds**

Approval of the total settlement amount does not end the analysis as the Court must now determine the distribution of the $3,000,000.00.  *See* Va. Code § 8.01-52.  This determination is inextricably bound up in disputes about the payment of costs, expenses, and reasonable attorneys' fees.

11

1. **Attorneys' Fees and Costs**

    a. **Fairfax and Martin are entitled to the 20% contingency fee as outlined in the signed engagement letter and some costs and expenses.**

On October 6, 2022, Wayne Lynch as administrator of the Estate, and Reichert as "Estate of Donovon W. Lynch, Signature of Client's Legal Representative," signed an engagement letter with Fairfax and Martin. ECF No. 114-2. In relevant part, the engagement letter sets forth the scope of work, fee calculation, reimbursement for expenses, and possible termination of representation. *Id.* at 1–2.

Neither the Estate nor Martin or Fairfax dispute that the signed engagement letter is a contract and that they are bound to its terms. However, they disagree about whether Fairfax and Martin should receive the 20% contingency fee under the contract. The Estate's position is that Fairfax and Martin should not receive any attorneys' fees and Martin should be reimbursed only for $9,894.76 of costs. ECF No. 116, at 4–5; ECF No. 131, at 2 (stating that Fairfax and Martin "are not entitled to any fees in light of their breach of contract"). The Estate asserts that no fee is appropriate because Fairfax and Martin were fired for cause. ECF No. 131, at 3–5. The linchpin of the alleged "for cause" firing of Fairfax and Martin appears to be that the attorneys "refused to submit a redline version of the settlement agreement to the City that removed the added terms" and did not pursue criminal charges against Officer Simmons. *Id.* at 5. The Estate states that Fairfax and Martin should, at most, receive quantum meruit "for time and material spent on behalf of the Estate." *Id.* And, the Estate claims that an award in quantum meruit "fails" or must be "severely reduce[d]" because of Fairfax and Martin's alleged failure to "establish the reasonableness of their hourly rates and the reasonableness of the hours worked." *Id.* at 2.

     i.     **Awarding Fairfax and Martin a contingency fee is appropriate.**

To start, the Court must decide whether it is appropriate to award a contingency fee to Fairfax and Martin. The Supreme Court of Virginia has ruled that where "an attorney employed under a contingent fee contract is discharged without just cause and the client employs another attorney who effects a recovery, the discharged attorney is entitled to a fee based upon quantum meruit for services rendered prior to discharge." *Heinzman v. Fine, Fine, Legum & Fine*, 234 S.E.2d 282, 286 (Va. 1977). The concern with awarding a contingency fee to a discharged attorney is that it "would interfere with the client's right to discharge counsel by subjecting the client to liability for two contingent fees." *Morris Law Off., P.C. v. Tatum*, 388 F. Supp. 2d 689, 709 (W.D. Va. 2005); *Heinzman*, 234 S.E.2d at 286. And, that it would be "speculative" to assume that the discharged attorney would have achieved "a recovery exactly equivalent" to that obtained by a later attorney and, thus, the contingent fee award would be "premised upon conjecture." *See Heinzman*, 234 S.E.2d at 286. In *Heinzman*, the attorney who was terminated and sought the contingency fee had not reached a final settlement on all claims. *See id.* at 283 ("Legum settled the property damage claim, deducted a fee of one-third of the gross amount recovered, and remitted the balance to Heinzman. At that time, . . . 'the (personal injury) case was not in a posture' to be settled.").

Fairfax and Martin, however, effectuated a recovery by settling the entire case on December 8, 2022. Unlike in *Heinzman*, there is no concern about the Estate being subjected to two contingency fees because the case subject to Fairfax and Martin's contingency fee had been settled. ECF No. 77. Moreover, unlike in *Heinzman*, the final recovery is not premised on "conjecture." *See Heinzman*, 234 S.E.2d at 286. It is not "speculative" that, if Fairfax and Martin

continued to represent the Estate, a "recovery exactly equivalent" to that ultimately realized by the Estate would have been achieved. *See id.*

Although the Estate asserts that Sherman was able to achieve "better" terms in the "Settlement Agreement and Release"—which memorialized the MOU signed on December 8, 2022—*see* ECF No. 118, at 3–4 (Sherman explaining that he "negotiat[ed] terms of a final settlement agreement and release of critical importance to the Estate"); ECF No. 131, at 5 ("New counsel achieved better terms."), the evidence supporting such a claim is lacking.

A comparison of the draft settlement agreement and release provided to the Court in December 2022 when Fairfax and Martin were representing the Estate, ECF No. 77-1, to the final agreement entered when Sherman was representing the Estate, ECF No. 104, reveals that the substance of the agreement remains the same. In describing to the Court those terms of the agreement that were disputed, the Estate focused on the term prohibiting plaintiff from instituting or prosecuting a claim, or aiding the same, against defendants related to the incident. *See, e.g.,* ECF No. 84, at 2. Sherman reiterated this position during the hearing on the motion to approve the settlement. The Estate supports empaneling a federal grand jury to indict Officer Simmons. *Id.* at 4. Accordingly, in the redline edits that Reichert was proposing in December 2022, the language regarding instituting or prosecuting a claim, or aiding the same, is completely redacted.[11] *See* Def.'s Hr'g Ex. 5, at 3. The final, signed, written document memorializing the settlement, however, retains the term prohibiting the institution or prosecution of any claim or action, but

---

[11] The Estate asserts that Fairfax and Martin refused to submit the "redline version of the settlement agreement to the City that removed the added terms" to the "Settlement Agreement and Release." ECF No. 131, at 5. As discussed below, the Court rejects this assertion.

deletes the clause "or in any way aid in the institution or prosecution."[12] *Compare* ECF No. 77-1, at 3 *with* ECF No. 104, at 3.

The foregoing comparison reveals that the document memorializing the settlement did not substantially change from the time Fairfax and Martin were counsel of record to May 24, 2023, when Sherman was counsel of record.  Furthermore, the case had been settled for $3,000,000.00 before Sherman became counsel of record, thus determining the contingency fee based on this sum requires no "conjecture."

To allow the Estate to benefit from the settlement achieved with Fairfax and Martin's efforts, while simultaneously excusing it from the terms of the engagement letter voluntarily signed, would deprive Fairfax and Martin's of their right to be compensated according to the contract.  Indeed, if the Estate is allowed to elude its contractional obligations, then "any plaintiff

---

[12] The Estate argues that the deleted clause "would prevent Mr. Lynch from participating in any way—even as a witness—in any matter brought by anyone, including federal or state prosecutors, in connection with Donovon's killing." ECF No. 131, at 5.  Although the Court need not interpret terms that were never agreed upon, the Estate's assertion appears questionable.  Among other things, any such agreement could only have bound Wayne Lynch in his capacity as *personal representative of the Estate of Donovon Lynch*.  Wayne Lynch, individually, is not a party to this case, and in that capacity, could not be a party to any agreement to settle this wrongful death action.  *See* Va. Code § 8.01-50 (authorizing only "the personal representative of such deceased person" to bring a wrongful death action and "compromise [such] a claim").  Therefore, if he possessed information about the events during which Donovon Lynch died, there appears to be no reason why Wayne Lynch, individually, could not assist in federal or state criminal investigations or prosecutions relating thereto. *See, e.g.*, *United States v. Bryan*, 339 U.S. 323, 331 (1950) (noting the "'fundamental maxim that the public . . . has a right to every man's evidence'") (citing Wigmore, *Evidence* § 2192 (3d ed.)).  No evidence, however, has been tendered to the Court that Wayne Lynch possesses any personal knowledge about the tragic events leading to his son's death on March 26, 2021.  Therefore, it remains unclear, if not speculative, about what assistance Wayne Lynch might provide in aid of any such criminal investigation or prosecution.  Finally, the parties to this civil settlement possess no authority to bind federal or state authorities with respect to the investigation and prosecution of any alleged crimes.  Cf. ECF No. 131, at 4 (arguing that termination of Fairfax and Martin was justified in part by their failure to pursue "Mr. Lynch's goal [of] . . . a federal indictment").  For these reasons, it appears to the Court that modification of the term highlighted by the Estate is less than consequential.

in a . . . case could, once a settlement offer is made, discharge his or her attorney, accept the settlement directly, then require the lawyer to accept only a quantum meruit fee. Such a result is untenable." *Page v. Baskerville*, 22 Va. Cir. 397 (Va. Cir. 1991).

This outcome is even more "untenable" here, where there is at least a suggestion that Fairfax and Martin were terminated so that their attorneys' fees would not have to be paid. The Estate's prior attorneys and defendants have insinuated multiple times that the real dispute that occurred after the settlement that led to the termination of Fairfax and Martin was Reichert's insistence that the settlement proceeds be paid directly to Wayne Lynch. *See, e.g.*, ECF No. 88, at 2 ("The Court should see Plaintiff's position on this motion for exactly what it is—an attempt to bypass important requirements designed to make certain that sums from a settlement are properly distributed. Instead of agreeing that the settlement check be made payable to both counsel and the Estate, and be placed in counsel's qualified fiduciary account, Plaintiff is instead insisting that the payment be made to him directly, which invites mischief."); *id.* at 4 ("[D]uring negotiation of the formal settlement agreement, a primary 'sticking point' was a requirement that the settlement check be made payable to counsel of record for Plaintiff, with Plaintiff insisting that the check be made payable to him alone."); ECF No. 133, at 6 ("The Estate raised no concerns over DOJ investigations through mediation or the subsequent negotiation of settlement terms *until after* Mr. Reichert took issue with the proposed distribution of settlement funds – funds which he, tellingly, attempted to steer to a bank account under his control."); *id.* at 10 (highlighting Reichert's "tortious interference" with the settled case "for what he perceives to be his own personal benefit"); ECF No. 139, at 78–79 (Fairfax testifying at the evidentiary hearing that, during his attempt to reach a formal signed settlement agreement, Reichert objected to, among other things, "how the check was payable"). This concern is further evidenced by the Estate's assertion that Fairfax and Martin

16

should not receive any attorneys' fees and Anchor Legal's fees should "not [] exceed $100,000.00." *See* ECF No. 116, at 4–5. Accordingly, non-speculative grounds for concern exist about whether the Estate, or persons purporting to act on its behalf, seek to obtain the settlement funds and disregard the attorneys' fees contract.

The Estate cites to *City of Alexandria v. Brown* to support the contention that Fairfax and Martin should receive no attorneys' fees. In *Brown* the Fifth Circuit affirmed the lower court's finding that the attorney provided "no productive value" to the client and was not entitled to fees. *City of Alexandria v. Brown*, 740 F.3d 339, 352–54 (5th Cir. 2014). Here, it cannot be seriously argued that Fairfax and Martin did not provide substantial value to the litigation efforts in this case. Fairfax and Martin both entered this case at a critical phase following the termination of Anchor on October 6, 2022, and at a time when numerous depositions had yet to be conducted before the close of fact discovery on November 10, 2022. ECF No. 33, at 2; *see* ECF No. 85, at 16–17, 28– 36 (discussing the Estate's "perilous" position and the limited time remaining for discovery in the scheduling order). Soon thereafter, with the benefit of Fairfax and Martin's advice, the Estate negotiated a settlement of $3,000,000.00. In fact, Wayne Lynch stated that "it is a great day" and "we have justice for Donovon Lynch" when reporting to the press that the case was settled. *Donovon Lynch Press Conference, Dec. 2014, 2022, 10 On Your Side Wavy.com*, https://www.wavy.com/video/donovon-lynch-press-conference-dec-14-2022/8232253/ (last visited September 7, 2023). This proclamation pointedly rebuts the Estate's contention that Fairfax and Martin's efforts were of little to no value.

The Court is further unpersuaded by the Estate's contention that Fairfax and Martin were fired "for cause" and thus are not entitled to any fees. Although unclear, the Estate appears to argue that Fairfax and Martin were fired for: (1) refusing to complete the services owed by

17

contract; (2) not pursuing criminal prosecution against Officer Simmons; and (3) refusing to "submit a redline version of the settlement agreement to the City that removed the added terms" and memorialized the terms in the MOU. ECF No. 131, at 2, 4–5. The Court's review of the record fails to support a finding that Fairfax and Martin were fired "for cause."

It is unclear what services Fairfax and Martin failed to perform under the contract. Notably, the engagement letter outlines that the attorneys did not guarantee a certain result or outcome. ECF No. 114-2, at 3. Also, Fairfax and Martin possess no authority or power to bring criminal charges against Officer Simmons. Fairfax and Martin also did not fail to submit redline versions of the "Settlement Agreement and Release" to opposing counsel. Under oath at the evidentiary hearing held May 24, 2023, Fairfax stated that he and Martin forwarded the drafts with the desired edits to opposing counsel. ECF No. 139, at 90–91. This is corroborated by defendants' hearing exhibit 5, which is a December 22, 2022 email from Martin to the City forwarding Reichert's proposed edits of the "Settlement Agreement and Release." *Id.* at 91–92. Critically, if the Estate indeed had "serious relationship-breaking complaints" about Fairfax and Martin "which went to the heart of [their] ability to perform services" for the Estate "in a reasonable way," or even if the Estate "entertained such complaints merely about" their services before the settlement, why did it wait to discharge Fairfax and Martin "for cause" until after they secured the $3,000,000.00 settlement?[13] *See Morris Law Off., P.C.*, 388 F. Supp. 2d at 713. At worst, the Estate's delay arguably suggests that it seeks to reap the benefits of such representation, without having to shoulder any responsibility to pay for the services rendered. At best, the delay exposes "a true lack of objective

---

[13] At an October 31, 2022 hearing to discuss the status of the Estate's representation, Fairfax and Martin appeared on its behalf. ECF Nos. 55, 57, 85. After discussion with the Court, the Estate continued to utilize Fairfax and Martin and did not seek to terminate their representation until December 26, 2022. ECF No. 90, at 3.

evidence to support any current 'for cause' defense." *Id.* Either way, the Court rejects the claim

that Fairfax and Martin forfeited their claim to attorneys' fees.

ii.   **The engagement letter mandates a 20% contingency fee for Fairfax and Martin.**

Therefore, having found that awarding a contingency fee is not otherwise inappropriate,

the Court must interpret the engagement letter signed by the parties. To interpret and apply the

terms of the contract, the Court must first look to Virginia contract law. For a contract to be

enforceable, there must be "mutual assent of the contracting parties to terms reasonably certain

under the circumstances." *W.J. Schafer Assocs., Inc. v. Cordant, Inc.*, 493 S.E.2d 512, 515 (Va.

1997) (citation and quotation marks omitted). The proper interpretation of such terms is a question

of law. *Bentley Funding Grp., L.L.C. v. SK & R Grp., L.L.C.*, 609 S.E.2d 49, 56 (Va. 2005). When

the contract's terms are clear and unambiguous, a court must construe it in accord with its plain

meaning. *Bridgestone/Firestone, Inc. v. Prince William Square Assocs.*, 463 S.E.2d 661, 664 (Va.

1995). Therefore, "[w]ords that the parties used are normally given their usual, ordinary, and

popular meaning. No word or clause in the contract will be treated as meaningless if a reasonable

meaning can be given to it, and there is a presumption that the parties have not used words

needlessly." *D.C. McClain, Inc. v. Arlington Cnty.*, 452 S.E.2d 659, 662 (Va. 1995).

Based on these principles and the provisions in the contract, the Court concludes that

Fairfax and Martin are entitled to the 20% contingency fee. The contract states that Fairfax and

Martin are entitled to 20% of the total amount recovered from any settlement "if that amount is

recovered <u>before</u> the first day of the trial currently scheduled to begin on April 4, 2023." ECF No.

114-2, at 1. Notably, as defined in Black's Law Dictionary, to recover means "[t]o obtain damages

or other relief; to succeed in a lawsuit or other legal proceeding." *Recover, Black's Law Dictionary*

(11th ed. 2019). The plain meaning of this provision indicates that, if Fairfax and Martin were

19

able to achieve recovery before trial, they are entitled to the 20% contingency fee. Fairfax and Martin did just that. They successfully negotiated and achieved a binding settlement before trial. The April 4, 2023 trial date was then removed after the notice of settlement was filed by the Estate. ECF Nos. 74–75.

The December 8, 2022 MOU is a binding agreement on all parties. When determining whether there is an enforceable settlement agreement, courts apply standard contract principles. *Topiwala v. Wessell*, 509 F. App'x 184, 186 (4th Cir. 2013) (citing *Bradley v. Am. Household, Inc.*, 378 F.3d 373, 380 (4th Cir. 2004)). The essential elements of a valid contract are "a complete agreement including acceptance of an offer as well as valuable consideration." *LongView Int'l Tech. Sols., Inc. v. Lin*, No. 160228, 2017 WL 1396062, at *2 (Va. Apr. 13, 2017) (quoting *Snyder-Falkinham v. Stockburger*, 457 S.E.2d 36, 39 (Va. 1995)).

The MOU is a complete agreement. The key terms and conditions of the MOU are plain. *See* ECF No. 77. The parties also intended to be bound by the terms of the MOU. ECF No. 77, at 2 ("Intent of the Parties. By the endorsements below, it is the intent of all Parties to be bound by the terms of this Agreement. Plaintiff agrees to be bound by the terms of this [MOU] and the City, upon formal approval of City Council, agrees to also be bound by these terms."). Furthermore, although the MOU contemplated that a subsequent document would "further memorialize[]" the agreement, *id.* at 1, the MOU is still a binding agreement to settle the case.[14] *Agostini v. Consolvo*,

---

[14] All parties agreed that the MOU was a binding agreement. *See* Pl.'s Mem in Opp'n to Joint Mot., ECF No. 84, at 3 ("The Estate seeks to avoid the Settlement Agreement [("SA")] as written by the City with additional terms, not the MOU."); *id.* ("The Estate stands by the terms of the MOU and remains ready and willing to sign a [SA] that matches the MOU."); *id.* at 6 ("The Estate considers the MOU a binding agreement containing all essential terms of settlement, manifesting objective intent to be bound by those terms."); *id.* at 7 ("The only binding agreement all parties assented to is the MOU, and the Estate desires to sign a [SA] memorializing those terms."); Simmons' Mem. of Law in Supp. of Joint Mot., ECF No. 83, at 1–2 ("The MOU states that the parties intended to be bound by its terms."); *id.* at 3 ("[T]he parties reached a complete agreement,

153 S.E. 676, 679 (Va. 1930) ("Where the minds of the parties have met and they are fully agreed and they intend to be bound there is a binding contract, even though a formal contract is later to be prepared and signed."); *LongView Int'l Tech. Sols., Inc.*, 2017 WL 1396062, at *2–3 (explaining that where the "contemplated formal contract" is meant to "set forth 'more fully' the 'terms of settlement'" already agreed to, rather than making the settlement "'subject to execution of a formal agreement,'" the finality of the settlement is "not dependent for its efficacy upon the execution of a formal contract").

Additionally, the later "Settlement Agreement and Release" that was signed after Fairfax and Martin were no longer counsel of record, ECF No. 104, does not negate the binding MOU of December 8, 2022. *See Jones v. Trustees of Isothermal Cmty. Coll.*, No. 1:18-CV-00367-MR-WCM, 2020 WL 3511599, at *3 (W.D.N.C. June 29, 2020), *aff'd*, 844 F. App'x 662 (4th Cir. 2021) (holding that a "reference to the preparation and subsequent execution" of a release "does not constitute any sort of modification to the terms of settlement reached by the parties in mediation; rather, it is an attempt to effectuate the agreement that had been reached").    In fact, it is not uncommon for attorneys to haggle over details of a more formalized document after a settlement

---

the terms and conditions of the agreement are readily ascertainable from the MOU, the parties have objectively manifested their intent to be bound by its terms, and there is no excuse for nonperformance."); *id.* at 4 ("Pursuant to Paragraph 10 of the MOU, Plaintiff expressly agreed to be bound by the terms of the MOU."); Fairfax's Mem. of Law in Supp. of Joint Mot., ECF No. 80, at 1 ("moving [the] Court to enforce the [SA] agreed upon and memorialized in the fully executed [MOU]"); *id.* at 5 ("The clear and unambiguous terms of the MOU were agreed to and signed."); *id.* ("There can be no dispute that the Plaintiff was made fully aware of the binding nature of the [MOU].") (emphasis added); City's Mem. of Law in Supp. of Joint Mot., ECF No. 82, at 4 ("[T]he parties reached a complete agreement, the terms and conditions of the agreement are readily ascertainable from the MOU, the parties have objectively manifested their intent to be bound by its terms, and there is no excuse or for nonperformance."); *id.* ("This MOU represents the complete agreement of the parties and is a legally binding contract in Virginia.").

has been reached and an MOU is signed. *See, e.g., Campbell v. Adkisson, Sherbert & Assoc.*, 546 F. App'x 146, 151–53 (4th Cir. 2013).

Accordingly, the termination of Fairfax and Martin after settlement does not preclude their receipt of a 20% contingency fee.   The contract provides that, if Fairfax and Martin were terminated, they were entitled to the "reasonable value of all services rendered (on a quantum meruit basis) and all costs and expenses incurred *prior to* the notice of termination."   ECF No. 114-2, at 2 (emphasis added).   However, the Estate terminated Fairfax and Martin after the case settled. *See id.* at 1.   Therefore, termination after settlement does not preclude recovery of the specified contingency fee.

### iii.     The 20% contingency fee is fair and reasonable.

The Court also finds that a 20% contingency fee is reasonable.   In fact, the specified 20% contingency fee appears to be significantly lower than many fee agreements. *See, e.g., Jackson v. United States*, No. 3:14cv15086, 2016 WL 3826379, at *11 (S.D. W. Va. July 13, 2016) ("For attorney's fees . . . a 33.3% contingency fee on the settlement . . . is fair and reasonable."); *Richendollar v. Bertini*, No. 93-1846, 1994 WL 266081, at *1 (4th Cir. June 17, 1994) (approving 33% contingency fee agreement in wrongful death suit); *Venegas v. Mitchell*, 495 U.S. 82, 84, 89–90 (1990) (finding a contingency fee of 40% in the civil rights action was reasonable); *Sanders v. Bailey*, No. 1:21cv236, 2023 WL 1163113, at *3, 5 (W.D.N.C. Jan. 30, 2023) (finding a 45% contingency fee reasonable and fair in a wrongful death action); *Amos v. Lesznik*, No. 4:18cv81, 2020 U.S. Dist. LEXIS 205563, at *16 (E.D. Va. 2020) (finding a 45% contingency fee was fair and reasonable in wrongful death/medical malpractice suit); *Moncrieffe v. Deno*, 882 S.E.2d 524, 527, 529–30 (Va. App. 2023) (upholding an agreement stipulating a 33% fee for settlement or a 40% fee for trial); *In re Peanut Corp. of America*, No. 6:10cv27, 2010 WL 3463212, at *9 (W.D.

22

Va. Aug. 25, 2010) (reducing attorney's fees from 45% and 40% to 33-1/3% of the $988,000 settlement, because "the vast majority of fee agreements are at the 33-1/3% level").   Although Fairfax and Martin were only the Estate's counsel for a few months before settlement, contingency fee agreements transfer significant risk of loss to the attorney taking the case and the number of hours worked is not the litmus test to determine whether a contingency fee is reasonable.  *See Moncrieffe*, 882 S.E.2d at 530.   The contingency rate specified in this case also implicitly acknowledges and reasonably recognizes that the Estate also owed fees and costs to Anchor.

Accordingly, for the reasons stated above, the Court **RECOMMENDS** Fairfax and Martin jointly receive attorneys' fees totaling 20% of the settlement, after their costs and expenses are paid.[15]

> #### iv.    **Fairfax and Martin's costs and expenses are, in part, unreasonable.**

Next, the Court must assess whether the costs and expenses claimed by Fairfax and Martin are reasonable.   The engagement letter provides that "all costs and fees associated with this litigation shall be paid after any settlement, award or recovery" and that Fairfax and Martin "may bill [the Estate] at cost for any charges paid to third parties." ECF No. 114-2, at 2.   However, if Fairfax and Martin anticipated "unusually large expenses," such as "out-of-town travel," then they would consult the Estate.  *Id.*

---

[15] The engagement letter does not specify whether costs and expenses would be paid before or after the contingency fee is calculated.  *See* ECF No. 114-2. Rule 1.5 of the Virginia Rules of Professional Conduct requires that a contingent fee agreement "shall state in writing the method by which the fee is to be determined," which includes providing for whether the expenses "are to be deducted before or after the contingent fee is calculated."  Va. Sup. Ct. R. 1.5(c).  Therefore, because the engagement letter fails to meet the requirement of Rule 1.5 and because sophisticated attorneys drafted the document, the Court finds that subtracting costs and expenses first and then calculating the contingency fee is appropriate.

After careful review, the Court finds that Fairfax and Martin's costs and expenses are, in part, unreasonable. Fairfax and Martin submit that they have $135,495.81 in costs and expenses. ECF No. 114, at 3. Martin claims a total of $38,091.04 in costs and expenses. ECF No. 114-1, at 3, 5. Fairfax claims $97,704.77 in expenses. *Id.* The Court has reviewed the documentation of the expenses set forth in ECF No. 117 and attached exhibits. Martin has provided sufficient documentation for most of his costs and expenses, which allows the Court to review them for reasonableness. Except for $1,370.70 for hotel and fuel to travel to Virginia Beach on November 4, 2022,[16] and $1,612.50 for a limousine ride from Washington, DC to Norfolk, VA, the Court finds Martin's costs and expenses are reasonable. *See* ECF No. 117-7, at 1, 4. Therefore, the Court **RECOMMENDS** awarding Martin $35,107.84 in costs and expenses.

Fairfax, on the other hand, fails to provide sufficient documentation for his expenses to enable the Court to properly review them. *See* ECF No. 117-9. As pointed out by the Estate, many of these expenses appear exorbitant and no explanation is provided for them. *See* ECF No. 131, at 12–15. For example, without documentation or explanation, Fairfax bills $454.47 for two meals on October 9, 2022, $1,253.40 for one meal on October 18, 2022, and $188.80 for "Supplies/Misc" on October 23, 2022. ECF No. 117-9, at 1–2. Fairfax does, however, provide an invoice from Win Digital Media, LLC, for $63,889.00 for expenses related to handling media and strategic planning. ECF No. 117-10; *see also* ECF No. 133, at 4 (asserting the Estate knew about such services and that "Wayne Lynch personally called on her . . . to work to generate public support for the case"). Therefore, the Court **RECOMMENDS** awarding Fairfax $63,889.00 in costs and expenses.

---

[16] This is the only expense Martin claims for which he does not attach supporting documentation. *See* ECF No. 117-7.

### b.     Anchor is entitled to only some of its claimed attorneys' fees and all costs and expenses.

The parties do not dispute that Anchor is entitled to a reasonable fee for work performed litigating this case. The only dispute is the value of the services calculated on a quantum meruit basis. Anchor's attorneys billed 621.20 hours from April 2021 to October 2022 totaling $215,302.50, plus $25,600.18 in costs.[17] ECF No. 115-7, at 21–33; ECF No. 132, at 1, 9.

In calculating an award of attorneys' fees, a court "must first determine a lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate." *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009). As for the rate charged for legal services, "the burden is on the fee applicant to produce satisfactory evidence . . . that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). Determining whether an hourly rate is reasonable "is fact-intensive and is best guided by what attorneys earn from paying clients for similar services in similar circumstances." *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994). The relevant market is "[t]he community in which the court . . . sits." *Id.*

The Virginia Supreme Court has set forth factors in *Campbell Cnty. v. Howard*, 112 S.E. 876 (1922), to determine the value of attorneys' fees in quantum meruit. *See Gilbert LLP v. Tire Eng'g & Distrib., LLC*, 689 F. App'x 197, 199 (4th Cir. 2017). These nine factors are as follows:

> the amount and character of the services rendered, the responsibility imposed; the labor, time, and trouble involved; the character and importance of the matter in which the services are rendered; the amount of the money or the value of the property to be affected; the professional skill and experience called for; the character and standing in their profession of the attorneys; and whether or not the

---

[17] While Anchor's fees and costs total $240,902.68, they are requesting $238,902.68 as the Estate made a $2,000.00 payment to Anchor. ECF No. 115-7, at 2.

> fee is absolute or contingent, it being a recognized rule that an attorney may
> properly charge a much larger fee where it is to be contingent than where it is not
> so. The result secured by the services of the attorney may likewise be considered;
> but merely as bearing upon the consideration of the efficiency with which they were
> rendered, and, in that way, upon their value on a quantum meruit [basis], not from
> the standpoint of their value to the client.

*Id.* at 200 (quoting *Campbell Cnty.*, 112 S.E. at 885). Many of these factors are similar to those

set forth in *Robinson*:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions
> raised; (3) the skill required to properly perform the legal services rendered; (4) the
> attorney's opportunity costs in pressing the instant litigation; (5) the customary fee
> for like work; (6) the attorney's expectations at the outset of the litigation; (7) the
> time limitations imposed by the client or circumstances; (8) the amount in
> controversy and the results obtained; (9) the experience, reputation and ability of
> the attorney; (10) the undesirability of the case within the legal community in which
> the suit arose; (11) the nature and length of the professional relationship between
> attorney and client; and (12) attorneys' fees awards in similar cases.

560 F.3d at 243–44. Moreover, the "primary difference between the lodestar calculation . . . and

the *quantum meruit* calculation set forth in the Virginia decisions appears to be in the area of the

relative importance placed upon the result achieved by the attorney. It is clear that, in Virginia,

the focus is on the objective value of the services rendered by the terminated attorney, not the value

of the benefit conferred." *Morris Law Office, P.C.*, 388 F. Supp. 2d at 715.

      i.      **Anchor's rate of $400.00 an hour for partners is reasonable but, due to the lack of information, the Court reduces the hourly rate of the paralegal and investigator to $75.00 an hour.**

The Estate does not challenge the reasonableness of Anchor's hourly rate of $400.00 for

partners. ECF No. 142, at 4; ECF No. 115, at 7. The undersigned is of the view that those hourly

rates are reasonable considering the evidence of the attorneys' years of experience[18] and fee awards

in similar cases in Norfolk. *See, e.g.*, *Denton v. PennyMac Loan Servs.*, LLC, 252 F. Supp. 3d

---

[18] Anchor asserts that the attorneys working on this matter have anywhere from 8–15 years of experience. ECF No. 115, at 8 n.4.

504, 522 (E.D. Va. 2017) (finding rates for attorneys between $425.00 and $575.00 to be reasonable); *Project Vote/Voting for Am., Inc. v. Long*, 887 F. Supp. 2d 704, 713 (E.D. Va. 2012) (finding rates up to $400.00 per hour for attorneys to be reasonable).  This conclusion is bolstered by the uncontested affidavit of a local attorney, C. Stewart Gill, Jr., Esq., that concluded that Anchor's rates were reasonable based upon his own professional experience, familiarity with Norfolk rates, knowledge of Anchor's attorneys experience and reputation, and Anchor's work on the case. ECF No. 136-4. And, the affidavits of another local attorney, Christian L. Connell, Esq., specifying that he charges a rate of $450.00 an hour for similar work. ECF No. 134-2, at 5; ECF No. 149-1, at 4.  Furthermore, considering that Anchor was originally providing services on an hourly basis and then changed to a contingency agreement with the Estate on April 13, 2022, ECF No. 115, at 2; ECF No. 115-3, Anchor's "top rate" of $400.00 is reasonable. *See* ECF No. 132, at 1; *Campbell Cnty.*, 112 S.E. at 885 ("[A]n attorney may properly charge a much larger fee where it is to be contingent than where it is not so.").

The Court does not find that Anchor has met its burden to establish that a rate of $150.00 for investigator "STB" and paralegal "TP," is reasonable. *See* ECF No. 132, at 9.  While there are billing entries for STB and TP, it is unclear what their qualifications are or how STB and TP's hourly rate is justified at $150.00 per hour. *See Denton*, 252 F. Supp. 3d at 521–22.  Although the billing entries for STB state "Investigator, Tommy Bird," the identity of TP is unknown. *See* ECF No. 115-7, at 3, 32.  Assuming TP is a paralegal, $150.00 is rather high considering that rate is generally awarded for paralegals with extensive legal experience. *See Virginia–Pilot Media Companies, LLC v. Dep't of Just.*, No. 2:14cv577, 2016 WL 4265742, at *5 (E.D. Va. Aug. 10, 2016) (finding a rate of $155.00 reasonable for a paralegal with over 20 years of experience).  And, Anchor has produced no evidence or made any argument about the reasonableness of a $150.00

27

an hour rate for the investigator.  Indeed, attorney Gill only finds that a rate of $150.00 for a paralegal is reasonable and does not discuss rates for investigators.  ECF No. 136-4, at 3. Therefore, absent other information about these two individuals, the Court reduces the hourly rate for the investigator and paralegal to $75.00 an hour, the lower end of compensable rates for these positions. *See, e.g.*, *Crump v. United States Dep't of Navy by & through Mabus*, 245 F. Supp. 3d 692, 707 (E.D. Va. 2017) (finding that an hourly rate between $100.00 to $125.00 for a paralegal is reasonable); *Dryden v. Accredited Collection Agency, Inc.*, No. 3:14cv255, 2015 WL 3646649, at *7 (E.D. Va. June 10, 2015) (approving $50.00 hourly rate for paralegal); *Anderson v. Didonato*, No. 1:12cv643, 2012 WL 6553675, at *6 (E.D. Va. Nov. 19, 2012) (awarding $140.00 hourly rate for paralegal), *report and recommendation adopted*, 2012 WL 6561259 (E.D. Va. Dec. 14, 2012); *Coles v. Land's Towing & Recovery, Inc.*, No. 3:10cv25, 2010 WL 5300892, at *4 (E.D. Va. Dec. 22, 2010) (approving $105.00 hourly rate for paralegal).

### ii.     The hours Anchor spent litigating this case are reasonable.

The Court now turns to whether the hours worked by Anchor are reasonable.  Specifically, the Court looks to "the amount and character of services rendered, and the responsibility imposed; the labor, time, and trouble involved; the character and importance of the matter in which services are rendered; and the amount of money [at issue]." *See In re Outsidewall Tire Litig.*, 636 F. App'x 166, 170–171 (4th Cir. 2016) ("[A] district court need not recite and make express findings as to each and every factor," but it must "analyze relevant factors in detail sufficient to allow for meaningful appellate review").

After analyzing the first five pages of Anchor's invoice, the Estate asserts that Anchor's fees should be cut by 50% "for duplicative services, block billing, and overworking a case as local counsel." ECF No. 142, at 2; ECF No. 132, at 9–11.  The Estate contends that the "total hours are

objectively unreasonable" and that Anchor provided an "utterly opaque summary of work performed." ECF No. 132, at 1–2. The Estate also asserts that in March 2022, Anchor "agreed with the Estate that Coe would cease working on the case," but the bills reflect Coe billing $37,000.00 after March 2022. *Id.* at 11.

Anchor was involved with this litigation at its inception. Anchor helped write, edit, and draft the complaint that was filed June 21, 2021. ECF No. 1; *see* ECF No. 115-7, at 3–7. Before the complaint was filed, Anchor drafted multiple spoliation letters to the City and surrounding businesses and investigated the shooting of Donovon Lynch. ECF No. 115-7, at 3–7. The attorneys then reviewed and responded to defendants' motion to dismiss and revised and filed an amended complaint. *Id.* at 8–10. Due to the high public interest and media coverage, the attorneys engaged in a public relations strategy and media interviews. *Id.* at 7, 9, 12. The attorneys prepared and appeared for hearings, drafted motions to quash subpoenas, and drafted a protective order. *Id.* at 11. Additionally, because Anchor was co-counsel with Quinn Emanuel, time was spent scheduling conferences and conferring with them about the case. *Id.* at 13–14. Anchor's attorneys also spent time engaging in discovery—such as drafting discovery responses, initial disclosures, objecting to discovery requests, and obtaining proper information and documents to sufficiently respond to discovery requests. *Id.* at 14–18. Further time was spent reviewing discovery received from defendants. *Id.* at 18, 20–22. Anchor also engaged multiple experts. *Id.* at 22–27, 30–31.

Anchor provided a substantial amount of services to the Estate to effectuate the favorable outcome. Anchor spent over 600 hours building the case, engaging in motions practice, and responding and reviewing discovery. Although the litigation may not have been "novel," cases brought pursuant to section 1983 and Virginia's wrongful death statutes are fact-laden, requiring diligent fact development and engaging in time consuming discovery, as seen in Anchor's bills.

Further, there were several discovery disputes, including motions to quash subpoenas to Reichert and responding to the City's motion to compel. Although the Estate contends that Anchor was supposed to have a limited role in the litigation, it is clear from the evidence and Anchor's bills that its attorneys took the lead on the case. *See* ECF No. 115-4 (email from Alex Spiro, an attorney at Quinn Emanuel, in August 2022 reminding Anchor that Quinn Emanual is "here in a limited and back up role" and that Anchor cannot "throw stuff on [Quinn Emanual's] folks at deadlines"); ECF No. 115-7. The case also received significant media attention, which Anchor had to navigate. Additionally, although the Estate asserts that Coe was not supposed to be working on the case after March 2022, no evidence supports this assertion. Indeed, the detailed billings and time Coe spent on the matter after March 2022 suggest otherwise. Also, the billing entries suggest that Wayne Lynch met with Coe about the case after March 2022, indicating that he was aware Coe was still working on the case. ECF No. 115-7, at 22, 32. Therefore, after reviewing the billing records and considering the record of litigation, the Court finds that the hours worked are reasonable and the litigation was not overstaffed.

The Court disagrees with the Estate's contention that Anchor's "block billing" prevents the Court from reviewing the reasonableness of the billing records. ECF No. 132, at 10. Generally, block billing is not prohibited by the courts. *See Project Vote*, 887 F. Supp. 2d at 716. If "tasks are reasonably listed in block listings, in a manner that provides a rational summary of the time spent on various projects, the Court will accept the block billing summary as reasonable." *N. Va. Real Est., Inc. v. Martins*, 80 Va. Cir. 478, at *6 (Va. Cir. 2010), *aff'd*, 720 S.E.2d 121 (Va. 2012). The block-billed entries noted by the Estate are sufficiently detailed to allow the Court to determine reasonableness. For example, Gantous billed 3.8 hours on May 5, 2021 for "[r]eview[ing] witness interviews of [D.M.] (audio record) and [K.J.] (written summary); work[ing] towards arranging

in-person interview of [K.J.]; meet[ing] and confer[ring] with Messrs. Lentz and Curtis Turner re: case update; review[ing] correspondence from Virginia Beach City Attorney's Office re: FOIA request; confer[ring] with Mr. Rod Ingram (VB City Attorney's Office) re: FOIA request and obtaining information." ECF No. 115-7, at 5. Such time entries provide a "rational summary of the time spent on various projects." *N. Virginia Real Est.*, 80 Va. Cir. at *6. Therefore, because the Court can review the reasonableness of the entries notwithstanding the block billing, the Court declines to reduce Anchor's attorneys' fees.

The Court also disagrees with the Estate that the attorneys engaged in duplicative billing. Having multiple attorneys working on a case is not inherently unreasonable; each attorney may be compensated for the reasonable hours spent working on a case. *See Randle v. H&P Cap., Inc.*, No. 3:09cv608, 2010 WL 2944907, at *6 (E.D. Va. July 21, 2010) ("There is nothing inherently unreasonable about a client having multiple attorneys, and they may all be compensated if they are not unreasonably doing the same work and are being compensated for the distinct contribution of each lawyer." (quoting *Norman v. Hous. Auth.*, 836 F.2d 1292, 1302 (11th Cir. 1988))). What is not compensable is multiple attorneys needlessly performing, and billing for, the same work. *Wyatt v. Owens*, No. 7:14-CV-492, 2018 WL 10613184, at *9 (W.D. Va. Jan 23, 2018) ("[T]he court must focus on the reasonableness of the division of responsibility between counsel."). For example, Lynch states that the 0.9 hours Gantous billed on May 6, 2021 for time that he spent, in part, reviewing "the [K.J.] matter" is duplicative of Lentz's 1.75 hours billed on the same day for "review[ing] . . . [the] possible suit regarding [K.J.]." ECF No. 132, at 10 n.5. However, this billing, as well as the rest cited by Lynch, does not demonstrate *unreasonable* duplication of work. *See Project Vote*, 887 F. Supp. 2d at 714. The overlap appears to be minimal and is expected for attorneys needing to keep abreast of information to provide adequate representation. *See Wyatt*,

2018 WL 10613184, at *9 ("[T]ime spent in intra-office attorney conferences is generally compensable."). Considering that the case needed detailed factual development, garnered significant media attention and public attention, involved extensive discovery, and involved working with a New York law firm—which is not requesting attorneys' fees—a need reasonably existed to coordinate and collaborate with co-counsel.

Accordingly, the Court finds that the hours Anchor spent litigating this case are reasonable and compensable.[19]

### iii.    Anchor's costs are reasonable.

Anchor has set forth costs of $25,600.18 directly related to the litigation. ECF No. 115-7, at 32–33. For example, Anchor seeks costs for filing the complaint, obtaining the autopsy report, serving process on defendants, and PACER fees. *Id.* These costs are uncontested. The Court finds these costs to be reasonable considering Anchor's approximately 18 months of work in this wrongful death action. Accordingly, the Court **RECOMMENDS** awarding Anchor $25,600.18 in costs and expenses.

### c.    Sherman's attorney's fees and costs are reasonable.

Sherman also filed a statement of costs and fees. *See* ECF Nos. 118, 134, 146. Sherman seeks $30,107.00 in attorney's fees and $267.36 in costs. ECF No. 146. Sherman is seeking a rate of $250.00 an hour for 140 hours spent litigating this case. ECF Nos. 134, 146. His hourly rate, hours worked, and costs are uncontested. ECF No. 126, at 4. The Court finds that Sherman's

---

[19] Although not specifically argued by the Estate, the investigator has one billing entry for 18 hours on September 13, 2022, for adding discovery into Haystack and uploading the link. ECF No. 115-7, at 28. This entry was on top of several others the same day. *Id.* The Court finds this entry to be unreasonable and will not compensate Anchor for this time.

hourly rate is reasonable. As demonstrate by case law cited above, Sherman's rate is lower than the reasonable rates charged in this area. Furthermore, the affidavit Sherman provided from a local attorney, Christian L. Connell, Esq., concludes that Sherman's rates are reasonable based on Sherman's experience, reputation, and his personal knowledge and experience. ECF No. 134, at 2; ECF No. 134-2.

The Court also finds that, upon review of the billing records, the hours Sherman worked are reasonable. Sherman negotiated terms with defendants after Fairfax and Martin were terminated by Lynch. ECF No. 118, at 2; ECF No. 104. Sherman spent time "briefing, preparing for and executing a settlement conference, and negotiating terms of a final settlement agreement and release of critical importance to the Estate." ECF No. 118, at 3. He has also spent time opposing Fairfax and Martin's attorneys' fees request. *See* ECF No. 146-1, at 17–18.

Additionally, Sherman's costs are reasonable. His costs are low and are expected and routine in civil litigation, such as costs of transcripts, copies, and the storing of electronic data. *Id.* at 4, 19, 22.

Accordingly, the Court **RECOMMENDS** awarding Sherman $30,107.00 in attorneys' fees and $267.36 in costs.

### d.   Kelleter's attorney's fees are reasonable.

On June 30, 2023, Keller filed a notice of appearance on behalf of Lynch for the limited purpose of opposing Anchor's attorneys' fees request. ECF Nos. 124–25. Kelleter seeks $14,025.00 in fees for a total of 33 hours at a rate of $425.00 an hour. ECF No. 147. These fees are uncontested. ECF No. 126, at 4; ECF No. 147.

The Court finds that Kelleter's hourly rate is reasonable. In Kelleter's affidavit, he states that he has been an attorney since 1997 and has been a solo practitioner since 2018. ECF No. 147-

2, at 1–2. Most of his work "arises from federal litigation and investigations" and he has handled over a hundred cases in the Eastern District of Virginia. *Id.* at 2. He contends that $425.00 an hour is aligned with those normally charged in Norfolk and he has "yet to have a potential client bring to [his] attention lawyers with comparable experience who charge a materially lower rate." *Id.* In setting his rate, he took into consideration the time constraints imposed by the Court to respond to Anchor's request for fees. *Id.* at 2–3. Although seeking a higher rate than those charged by Anchor or Sherman, Kelleter has over 25 years of experience and has specific experience litigating in federal court. Also, because of Sherman's conflict with Anchor, Kelleter was obtained on short notice with limited time to respond to Anchor's fee request. The affidavit Kelleter provided from local attorney, Christian L. Connell, Esq., also supports his rate of $425.00, ECF No. 149-1, which is within the reasonable rates charged in Norfolk. *See, e.g.*, *Crump*, 245 F. Supp. 3d at 703, 716 (awarding $400.00 an hour to a law firm founding partner with 39 years of experience); *Two Men & A Truck/Int'l, Inc. v. A Mover Inc.*, 128 F. Supp. 3d 919, 927 (E.D. Va. 2015) (awarding $600.00 an hour for an attorney with more than 25 years of experience and $400.00 an hour for an attorney with five years of experience).

After reviewing the billing records, the Court finds Kelleter's hours worked (33) are reasonable. ECF No. 147-1. His work in the case involved a close analysis of Anchor's 32-page billing records and the reasonableness of its hourly rate and hours worked. ECF No. 147-2, at 3. He also had to "develop[] a working understanding of the case and the roles of each attorney retained by the Estate . . . since the reasonableness of Anchor's fees intrinsically required an understanding of what role Anchor played in relation to other attorneys." *Id.* This included reviewing emails, speaking with the client and other attorneys, and researching case law. ECF No. 147-1.

Accordingly, the Court **RECOMMENDS** awarding Kelleter $14,025.00 in attorneys' fees.

**2.      Funeral Expenses**

Under section 8.01-54, after attorneys' fees and costs are paid, the personal representative must then distribute the amount specifically allocated for funeral expenses.  Funeral expenses in this action have been established by the Estate's submission of an invoice in the amount of $12,038.60.  ECF No. 116-4.  These expenses were paid by Wayne Lynch, the father of the decedent. *Id.*  The parties do not dispute the funeral expenses.  The undersigned **RECOMMENDS** that Wayne Lynch be reimbursed for paying the funeral expenses.

## V.      RECOMMENDATION

Having considered the evidence and finding that the compromise is fair and reasonable, the undersigned **RECOMMENDS** that the Estate's motion to approve the settlement, ECF No. 116, be **GRANTED in part** and **DENIED in part**.  The undersigned further **RECOMMENDS** that Sherman's motion for costs and fees, ECF No. 118, as supplemented, ECF Nos. 134, 145, be **GRANTED**.

The settlement funds shall be paid to plaintiff's attorney of record, Sherman, for deposit into his trust account and for distribution in the manner provided below, pursuant to the Court's order:

- Attorneys' fees and costs to Fairfax and Martin[20]: **$679,197.47**
  - Martin's costs after reduction: $35,107.84
  - Fairfax's costs after reduction: $63,889.00
  - Fairfax and Martin's attorneys' fees award calculated after costs:

---

[20] Fairfax and Martin also seek "interest" for their attorneys' fees and costs.  ECF No. 121, at 2. However, as they provide no explanation, basis, or calculation for the interest sought, the Court declines to grant this request.

- ▪ $3,000,000.00 - $35,107.84 - $63,889.00 = $2,901,003.16
- ▪ $2,901,003.16 x 20% = <u>$580,200.63</u>
  - • $348,120.38 (60%) payable to Fairfax[21]
  - • $232,080.25 (40%) payable to Martin
- • Attorneys' fees and costs to Anchor[22]: **$229,635.18**
  - o Anchor's attorneys' fees after reduction:
    - ▪ attorneys' hours (488.60) x attorneys' rate ($400.00) = $195,440.00
    - ▪ paralegal/investigator hours (132.6 − 18 = 114.60) x paralegal/investigator rate ($75.00) = $8,595.00
    - ▪ $195,440.00 + $8,595.00 = <u>$204,035.00</u>
  - o Anchor's costs: <u>$25,600.18</u>
- • Attorney's fees and costs to Sherman: **$30,374.36**
  - o Sherman's attorney's fees: <u>$30,107.00</u>
  - o Sherman's costs: <u>$267.36</u>
- • Attorney's fees to Kelleter: **$14,025.00**
  - o attorney's hours (33) x attorney's rate ($425) = <u>$14,025.00</u>
- • Funeral expenses to Wayne Lynch: **$12,038.60**

---

[21] Fairfax and Martin have agreed to split the contingency fee with 60% payable to Fairfax and 40% payable to Martin. ECF No. 117-9, at 1.

[22] Anchor sought "costs, expenses, and attorneys' fees, *plus interest*, [to] be included as part of the expected distribution of settlement funds." ECF No. 115, at 8 (emphasis added). Because Anchor provided no explanation, basis, or calculation for the interest sought, the Court declines to grant the request for interest.

The remainder of **$2,034,729.39** shall be paid to Wayne Lynch as the sole beneficiary.[23]  *See* Va. Code §§ 8.01-53–54.

Consistent with paragraph 11.0 of the parties' agreement memorializing the settlement, ECF No. 104, defendants shall pay the sum of $3,000,000.00 to plaintiff's attorney of record not later than seven days after final approval of the settlement. Not later than seven days after receipt of said monies, plaintiff's attorney Sherman shall disburse those monies as directed by the Court. Not later than seven days after such disbursements, Sherman shall file a report with the Court documenting compliance with the specified disbursements. Finally, not later than seven days after the filing of Sherman's report, the parties shall file a notice of dismissal with prejudice and a proposed order.

The Clerk shall forward a copy of this report and recommendation to counsel of record, as well as to Anthony Gantous, Esq., Joshua Coe, Esq., Justin Fairfax, Esq., and Thomas Martin, Esq. The Clerk shall mail a copy to Lauryn Lynch at the address provided to the Court.

## VI.   REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

---

[23] Although the Estate asked the Court to distribute $62,865.00 to US Claims to satisfy a debt Wayne Lynch secured with the litigation, the Court cannot do so pursuant to Va. Code § 8.01-54. ECF No. 116, at 5; ECF No. 140. In relevant part, the statute provides that "[t]he amount recovered in any such action shall be paid to the personal representative who shall first pay the costs and reasonable attorney's fees and then distribute the amount specifically allocated to the payment of hospital, medical, and funeral expenses. The remainder of the amount recovered shall thereafter be distributed by the personal representative, . . . provided that any distribution made to any such beneficiaries shall be free from all debts and liabilities of the decedent." Va. Code § 8.01-54. The funds borrowed from US Claims were used for the Estate's "economic necessities and not to support or aid in the Litigation." ECF No. 140-1, at 3. Therefore, the debts do not fall under any of the categories set forth in Va. Code § 8.01-54.

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.      A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

_____
/s/
Robert J. Krask
United States Magistrate Judge

Norfolk, Virginia
September 8, 2023